Please rise. The Illinois County Court of Appeals Division is now in session. I'll offer Justice Eileen O'Neill a word from the side. Good morning all. Lisa, can you call the first case? 14-3728. Everybody can have a seat. Thank you. Justice Gordon, let me know. I forgot that portion of the opening of court, so I won't forget that again. All right. Can the attorneys on Eric Smith approach the podium, please? Could you identify yourselves for the record? Sure. My name is Jonathan Krieger. I represent Eric Smith. My name is Dylan Raystraw. I represent the People, Assistant State Attorney for the County and State Attorney's Office. Mr. Krieger, how much time would you like? Just reserve three minutes for rebuttal. Okay. So 12 minutes in your opening and three minutes for rebuttal. Mr. Raystraw? Fifteen minutes, Your Honor. Is this your first argument? It is. We won't be too hard on you. This will be the hardest argument you ever have, I guarantee it. All right. All right, Mr. Krieger, you can begin. Thank you, Your Honor. May it please the Court, the briefs raise many issues. I plan to discuss the first three, the prosecutorial misconduct and jury instructions. If the honors would like to focus on any other issue, I'm happy to discuss it. All right. Go right ahead, Mr. Krieger. When it brings a criminal case, the State must stick to the law of evidence, cannot rely on emotion to win a conviction. When the State departs from the record or introduces evidence intended to inflame jurors, that is misconduct. Mr. Krieger, this is a pretty emotional case, though. You have a baby who's stabbed and a father who's an exemplary member of the community. How can you hold the State to a standard that you can't elicit emotional evidence? When the case facts in and of themselves are emotional. Every murder is somewhat emotional. A person dies. Some more than others. Some more than others. This one did involve a baby was injured and there was a lot of blood. It was a man who died a bloody death. However, especially in jury trials, there are limits on what kind of evidence can be introduced. So the statement that you're focusing on in the opening statement, would you think that statement would have the same prejudicial impact if it was brought up in a closing argument as opposed to opening? It would have a different prejudicial impact. I don't know if it would be the same. In this case, it was the introduction. It was the first words that the jurors heard, which would be prejudicial. On the other hand, closing argument would be the last thing that the jurors would hear. In this case, some of the themes were raised in closing argument again. He was again referred to as a newlywed. My client was referred to repeatedly as a mean person. And the prosecutor raised Kelly Marie Hartman's inflammatory testimony in very dramatic terms in closing. So although the focus of our argument is the evidence, and to some extent the prosecutor misconduct in opening statements in terms of assessing prejudices, this court can look to closing argument where it all was brought up once again. This morning I wanted to focus on the 911 tape, which was a gratuitous, inflammatory piece of evidence introduced below. The tape was admitted following Kelly Marie Hartman's testimony, in which she gave her account of encountering Fiat's nanny, the victim, after he had been stabbed. After a defense objection, the court cut off testimony, cut off questioning, finding that her testimony was, quote, very overwhelming from an emotional point of view. Is it because of her testimony where she was extremely emotional, or is it because of the 911 tape where you hear emotions on? We raised both of them as errors. First, I think the 911 tape is the starkest example, because at that point the court had noted that several of the jurors were already crying, and noted that the testimony was very overwhelming. But nonetheless, over the defense objection, the court allowed the 911 tape to be admitted. So they're both errors, and they're both prejudicial, but if Kelly Marie Hartman's testimony had marginal relevance, but was overshadowed by the prejudice, in the 911 tape any relevance had dissipated, and it was purely prejudicial. And in that tape, much of what was said during Hartman's testimony was repeated. She said there's a man bleeding in the middle of the street. She said he's full of blood. She said, oh God, the blood, and she handed the phone off to her husband, Tim, who was also gasping and said he's on the run, bleeding to death. He's not moving. When the operator said, you know, help us on the way, and some police officers showed up, he said, we don't need officers, we need an ambulance here. So the 911 tape had both the gore of the original live testimony and this kind of sense of alarm over the fact that it had been five minutes since the call and no one had come to try to help Mr. Matney. I mean, you're taking each item. How about its cumulative effect? Right. I think the cumulative effect was to deny my client a new trial. As I alluded to, the prejudicial argument in his conduct began in opening statement and was repeated during the extensive live testimony, then in the 911 tape, even though at that point the judge knew that there were jurors that were crying that Hartman had been crying throughout her testimony was in the words of defense counsel hysterical. What should a trial judge do when somebody starts breaking down and crying and doing things like that? What should the trial judge do? Well, with regard to that testimony, it is a little bit of a tricky situation. A judge wants to be able to allow the parties to put on their cases. But at the same time, the judge wants to be able to... Should the trial judge stop the trial? Get people to obtain their composure and then start again? Is that what the trial judge should do? I think that that would have been a reasonable response to have said, to have stopped the proceedings and said to the state's attorney, what are you trying to elicit from this witness? And kind of get to it. I think this revenge trial would not have been nearly as extensive. Her law testimony wouldn't have been nearly as extensive as it, in fact, was. And, I mean, in terms of relevance, the state has not really given a good reason to make either her law testimony or the 911 tape. And I don't see one evidence from the record. Now, with regard to the law testimony, it was, I guess it showed his dazzle, though there wasn't a medical testimony that he had died at that point. But that testimony, that evidence had already been elicited when the petty stipulated to the testimony of the medical examiner who had conducted the autopsy and who detailed the wounds to Mr. Manning with much more precision than Hydeman did during her testimony. So it's important also in this case to remember what was in dispute, which is that no one doubted that my client was the one who committed the stabbing in this case. The only question was what his mental state was. The defense raised the issue of insanity. Before trial, the jury was quite worried about their attitudes towards mental state. Everyone knew that the only question was what my client was thinking when he committed the stabbing in this case. And later on in trial, the defense would present their expert saying that my client suffered from schizophrenia and couldn't appreciate the criminality of his acts. And the defense and the state would present its own expert saying that he merely had a personality disorder and was malingering. And given this, that was the only issue in dispute, and the prosecutorial misconduct in this case might have been the thing that tipped the jurors towards a guilty verdict rather than an acquittal. Well, was this defendant really prejudiced by this? Wasn't the evidence so overwhelming here that it wouldn't make a difference what happened? I don't think so at all. I think both the defense expert and the state expert offered what you could say were reasonable opinions. The question was which ones the jurors would credit. So Dr. Georgia Connick, who testified for the defense, had seen my client before the arrest, crucially, and then interviewed him afterwards. She reviewed the police reports. She looked into the family history, which is something that the state's expert did not do. The family history, which included schizophrenia, and diagnosed him to have schizophrenia and not to understand the criminality of his actions. The state expert only interviewed him after he had been arrested, and as we'll come around to, some parts of his testimony didn't really make a lot of sense. At one point he said you could tell objectively if someone was suffering from schizophrenia, but then later on in that same passage seemed to indicate that you couldn't, that there needed to be more close observation to determine if someone suffered from that mental illness. But at that moment, it was not an isolated error. The state started the case by introducing Eric as a bad person, then introduced Heidman's thought testimony about Theus' body death, including the testimony about the Lord's Prayer being said over him. The earliest evidence and argument were then repeated in closing argument. The state confirmed a few other errors, denied my client a fair trial, should be given a new one free from prosecutorial misconduct. Turning to the first jury instruction issue, my client was charged with two charges. Can I just stop you a second? Of course. What do you say to the state's response about the 911 call? The state says it was relevant because the defense was reserving the right to make arguments about where people were positioned. What's your response to that? I guess I didn't get that from the state's brief as to where people were positioned. But to answer your question, I don't see how that would be relevant. Positioned vis-a-vis the stabbing, I mean, they cite the Jurtschik case where what was recorded on the 911 tape was the stabbing itself. This case isn't that case. In Jurtschik, they found that the tape was the most probative evidence available for actual commission of the crime, and in this case, the most probative evidence was the testimony of Siobhan Manning and Floyd Wimberly. They testified to actually seeing the stabbing. This took place outside Eidman, and the husband never claimed to see my client. He never claimed to see the stabbing. All they saw was Fias's bloody death. Okay. With regard to the jury instructions, my client was tried on two charges, the first-degree murder of Fias Manning and the attempted first-degree murder of Brooklyn Manning. Under the law, the jurors needed to be told at the office that they could return different verdicts for each offense. State's instruction number six, however, did not give split verdicts as an option. It told the jurors they could return one verdict for both offenses. The instructions listed the verdict options as one not guilty, two not guilty by reason of insanity of both crimes, three guilty of both crimes, and four guilty but mentally ill of both crimes. There's no question this instruction was incorrect. The jury, of course, must be able to give independent consideration to each of the charges. In its brief, the state does not contest that the instruction gave the wrong law. They only argued that the other instruction somehow fixed the problem. The other instruction, however, did not fix the problem. Although the jurors were given separate issues, instructions, and verdicts for each of the offenses, that could not undo the wrong initial advice given by state's instruction number six. And this case involved the real possibility of a split verdict. To prove the attempt charge, the state needed to show intent to kill Brooklyn Manning, who was a baby in her father's arms. Those witnesses to the stabbing, Siobhan Manning and Phil Wimberly, only testified that the client was attacking Thea, not that he was attacking the baby. And all the evidence was that he had only hit Brooklyn Manning incidentally. During the deliberations, the jurors could reasonably have found that the state had not proven intent, but rather than decide wholesale to acquit my client, to convict him. And that's the prejudice from this error. Do I have time for the third one? Yep. All right. In that case, given the cost of controlling misconduct in this case, and the instructional error, we would ask that you reverse my client's conviction and remand him to trial. Thank you, Mr. Krieger. Mr. Rixta? Good morning, Your Honors. May it please the Court, Assistant State Attorney Dillon Rixta on behalf of the people of the State of Illinois. Mr. Rixta, what was the purpose of the 911 call if it was already established that the defendant did the murder, and what did the 911 call add to the state's evidence? Your Honor, the defense counsel pled not guilty. That puts all aspects of the charge at issue. Okay. So we got two eyewitnesses saying he did the stabbing. The defendant isn't contesting whether he did the stabbing. The defendant is just contesting his mental state. So what's the purpose of the 911 call? Your Honor, the defense counsel did state that he intended to challenge the entirety of the people's case. Also, the 911 call is relevant to the narrative events immediately after the stabbing. It's relevant to the defendant's sustainability. Okay. So I'll give you that. Let's say 911 call is relevant. Why are you putting her on as well? Your Honor, the defense counsel... I'm sorry, I'm saying her. I can't recall her name right now. Kelly Heitman. Thank you. Your Honor, the defendant is not entitled to a sanitized version of the prosecution. It's all case approved, and it's all averted to me. Okay. So her blubbering on and on and on on the stand, what does that do? You don't think that has a prejudicial impact on the jury? Your Honor, Kelly Heitman's testimony, the trial court didn't properly use its discretion when it didn't allow her to testify as to the photos. She was a witness who came to the aid of C.S. She doesn't witness the crime. She just witnesses him coming out and bleeding. So it's not even a witness to the crime. It's just how horrific the death was, isn't it? Respectfully, Your Honor, no. Kelly Heitman was there as Mr. Manny came to his aid. She is relevant to the defendant's insanity defense. How? Because defense counsel's expert witness said the defendant was in a psychogenic state. Obviously, the insanity defense. Defendant was nowhere to be seen. He was out there standing around the street in a daze. He was not sitting there asking what's happening. If the psychotic defendant didn't react the way that you think he should react, somehow her testimony becomes relevant to what? Her testimony is relevant to painting the picture to the jury of what was taking place immediately after the stabbing. The defendant was not on the street, not sitting there asking what's going on. He was sprinting through backyards, running away from his crime. He was disposing of evidence. Did Kelly Heitman testify to that? Kelly Heitman did not testify. Did she testify at all about what the defendant was doing? Did she see him at all? She did not see him going through the backyard, but she did testify as to the surroundings of what was going on in the middle of the street. The hysterics and the pandemonium that was going around, how does that make the defendant's mental state more or less likely? How does that establish the state's case? Your Honor, it's relevant to show that the defendant was not sitting there with the rest of the family members. She was not in this psychogenic state. But she did not say that. She didn't testify about that at all, did she? She did not testify to that, but she testified as to, as I mentioned, the circumstances that were in the street at that time. Also, the 911 call was also relevant to the narrative of offense and to the defendant's insanity defense for the same reasons. The 911 call was our best piece of evidence showing exactly what was taking place after the stabbing. Wasn't your best piece of evidence the two eyewitnesses who testified to the stabbing? The 911 tape was the best piece of evidence in the narrative of offense after the stabbing as Fias was passing away. Our best evidence to the crime itself, you are correct, was the eyewitnesses to the crime. Okay, let's talk about the opening statement where the prosecutor pretty much said the defendant is bad and the victim was good. How is that an appropriate opening statement? Your Honor, the prosecutor's comments in the opening statement were focused on the evidence to be presented at the trial. The prosecutor introduced the victim, introduced the facts of the case, and told the jurors what evidence the prosecutor expected the juror would hear and ultimately did hear. This was a very emotional case. This is a very emotional thing that happened. This was a terrible circumstance. So it was emotional to begin with. Do you think it's appropriate for the prosecution to exacerbate the emotion and bring it out in the opening statement? Your Honor, the comment was made only briefly as part of a general introduction to the facts of the case and to who the victim was and to why they were there that day, why everyone was at the manning home celebrating the end of the religious fast. Also... Didn't the prosecutor say something along the lines of the victim is everything, the defendant is not? That is correct, Your Honor. What does that do? That was a brief comment. Do you agree it was an improper comment? If it was error, Your Honor, it was harmless error. The evidence in this case was so overwhelming that that brief comment of one sentence and multiple pages of opening sentence or opening statement would not have took the scales. Do you... You don't think that that's pushing the envelope, saying that this was everything, that the defendant is not? You don't think that that's pushing the envelope too far? Your Honor, this was an emotional case and the prosecutor... Well, I mean, it's a simple question. You either believe it is or it isn't pushing it too far. I don't believe this. I do not believe that this comment did push it too far. It took it too far. It was an introduction of what the jury would hear through the evidence presented, Your Honor. Do you think when the witness started having an emotional outburst on the stand that the trial judge should have done something to curtail that? The trial court did exercise its discretion by not allowing her to continue her testimony through the photos of Thea Smith. That's another reason why... So the gruesome photos through the witness who was already highly emotional, you don't think that that establishes any prejudice to the defendant when a witness is testifying about crying and praying over him? You don't think that that could have been slightly prejudicial to the defendant? And the trial court did not allow that testimony. That testimony did not come in. The photographs. The photographs. I'm talking about her testimony about him passing and her praying over him and her hysterical crying. Your Honor, this is what happened. This is what happened in the case. This is what took place. So my question is, do you think the trial judge is in any way required to limit the emotions in a case that's already emotionally charged? The trial court probably... Respectfully, I do not, Your Honor. Do you think the trial court acted properly here when the witness became emotional and started to cry and you don't think the court should have stopped it there so she could regain her composure and then proceed? Do you think this is the way cases should be tried? Your Honor, the trial court did briefly stop the testimony of Ms. Heitman. She was not allowed to testify as to the photos. This is more reason why the 911 take was so important for the state and so relevant to the facts of the case. The defendant is not, as you mentioned, this is a very emotional case. The defendant is not entitled to a sanitized version. Defense counsel clearly stated he wanted to challenge the entirety, every aspect of our case. That's our burden of proof and it's our case to meet. You don't think that that's pushing the envelope, putting on that witness, putting on the 911 take, that that's going a little bit too far? Your Honor, this is a very emotional case. We can't... Well, how about a defendant's rights to a fair trial? Does that go out the window when you have an emotional case? No, absolutely not. But the... Can a defendant receive a fair trial when things like this happen? He can, Your Honor, and he did receive a fair trial. These comments and opening statement and the evidence presented at trial did not erode the integrity of the judicial process or undermine their fairness. The evidence of the defendant's guilt here was absolutely overwhelming. It was overwhelming because defendant wasn't contesting the actions. So when you have an overwhelming evidence where defendant isn't contesting his actions, what's the purpose of putting on all this emotionally charged testimony other than to sway the jury? Your Honor, the defense counsel did state that he planned to challenge every aspect of the case, and this was relevant to the insanity defense. We needed to paint the entire picture of what happened that day. How does the victim gasping for air and sucking blood and Kelly Heitman saying a prayer for him, what does that have to do with anything in the case, with any element of the offense, or the affirmative defense of insanity? The defendant did plead not guilty here. Yeah, but what does that have to do... How does that help you prove your case, that she said a prayer for him? It doesn't. You made a statement, and you're saying here that the evidence was overwhelming. If it was overwhelming, then you didn't need any of these things that impinged on the defendant's rights to appear at trial. You didn't need to put out the 9-11. You didn't need to put out the witness. You didn't need to make statements that the deceased was such a great man and the defendant's above. You didn't need to do that. It's a push of the envelope too far. Your Honor, respectfully, the defendant did not only plead not guilty, but the defense counsel was cross-examining our eyewitnesses as to what took place that night. Doesn't the defense lawyer have the right to cross-examine the witness? To bring out facts? Absolutely does. That is the right. When the defense counsel is cross-examining the eyewitnesses of the crime, they're not just submitting that this happened exactly how it was stated. It's our burden to prove, and our burden to meet, and we have to make sure that every part of the prosecution is made, every part of our case is made. But you have a duty not to inflame the jury. We do have a duty not to inflame the jury, and the comments and opening statement and the evidence presented at trial in this case did not rise to the level of inflaming the jury. Okay. Mr. Gregstad, do you want to address the jury issue? Your Honor, there was no error in the jury instructions. It's important to note that there was no objection at trial. The defense counsel offered no instructions of his own, and the defendant did not include this claim in the post-trial motion. At trial, both attorneys discussed the instructions. The state went through the instructions step-by-step in closing arguments. The charging argument or instruction, People's No. 6, correctly stated the law and was not viewed in isolation by itself. When viewed with the other instructions, they properly instructed the jury to independently analyze each offense. Also, the jury was given IPI No. 26.0188 Concluding Instructions. These are specifically meant to be tied to the charging instructions, specifically to prevent jury confusion and instruct independent evaluation of each charge. The jury was given separate definitions instruction for each charged offense, and the jury was given separate issues instructions for each charged offense. These issues instructions, No. 17 and 18, went through step-by-step analysis that the jury was supposed to go through. So therefore, it's okay then that jury instruction No. 6 was incorrect? Because the later ones did the step-by-step instruction? Jury instruction No. 6 was correct except for... Well, except for means it wasn't correct. So let's start with that. So is your argument that 17 and 18 corrected 6? My argument is that when viewed as a whole, the jury was properly instructed as to the law. Although the jury instructions may not have been absolutely perfect, they were definitely not misleading and did not rise to the level there. Also, the jury was given four separate jury forms, or verdict forms, for each of the charged offenses. So they were not allowed to pick a D, all of the above. They had to separately analyze and bring a verdict for each charged offense. After only one hour of deliberation, the jury did sign two separate verdict forms, demonstrating they understood each charge was meant to be analyzed independently and did require a separate finding. Also, even if there was any error in the instructions, the defendant cannot establish plain error. To mention the evidence in this case was overwhelming. The evidence, there was ample evidence to justify the jury's conclusion that the defendant had a specific intent to kill both Fias and Brooklyn Manning. There was absolutely no evidence that Brooklyn was hit only incidentally. The evidence that we do have here is there's multiple witnesses of the crime. Defendant's sentencing defense was weak to begin with and then was completely rebutted by Dr. Nakani's testimony. The state's expert witness, Dr. Nakani, was far superior to Dr. Connick, to the defense counsel's expert witness, Dr. Connick, on all levels. Education, qualifications, opinion, the resources that the opinion was based on, and also striking an infant in the face with a knife is kind of the natural tendency to destroy one's life. This is a six-month-old girl being stabbed in the face. There is ample evidence to justify the jury's conclusion that the defendant had a specific intent to kill both Fias and Brooklyn. Unless you have any other questions regarding any of the other issues, for these reasons and those stated in our brief, we ask this court to affirm the defendant's conviction. Thank you, Mr. Rickstrom. As I told you, this is probably the hardest argument you'll ever have. So thank you. Thank you. Mr. Krieger? Do you have any other questions? No. No? Thank you, Mr. Krieger. Thank you, gentlemen. We are going to adjourn and reshuffle our panel. We'll take the matter under advisement and issue an order as soon as possible. Thank you.